IN THE UNITED STATES DISTRICT COURT
FOR THE ELEVENTH CIRCUIT
CIVIL DIVISION

Michael V. Lombardi (U.S. Opportunities, LLC ), 16314-043
Federal Correctional Institution
P.O. Box 779800
Miami, FL 33177
 Plaintiff

v.

The Department of Homeland Security (C/O Agent Jason Elder)
14090 Airport Road
Gulfport, MS 39503
 Defendant



FILED by _____ D.C.

AUG 2 1 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## Complaint

The plaintiff brings this action for damages in excess of Fifty Million Dollars ($50,000,000+) against the defendant, The Department of Homeland Security, c/o Agent Jason Elder, due to Agent Elder's many counts of negligence against Michael V. Lombardi (U.S. Opportunities, LLC), the plaintiff.  Said actions resulted in a loss of both current and future earnings.  Additionally, the plaintiff had to serve a 51 month prison sentence, which permanently damaged his name and reputation, as well as permanently severed his family relations with his wife and children.

## Jurisdiction

This case was filed in Federal Court, since the amount in controversy is greater than $10,000.  The action was filed in Federal Court in the Eleventh Circuit of the United States, since Michael V. Lombardi (MVL)/ U.S. Opportunities LLC (USO) operated out of West Palm Beach, Florida and was a company formed, from its inception as a Florida Corporation.  Additionally, many of the negligent acts performed by Agent Elder were performed in Florida.

## Case Background

The Plaintiff owned and operated U.S. Opportunities, LLC from 2006 until

2011.  USO was a company that specialized in finding H2B visa workers for various companies throughout the United States.  They performed the following services for an inclusive fee:

1.  Made arrangements with various international recruitment agencies who supplied H2B visa employees who were qualified to meet particular employers needs.

2.  Set up interviews for the customer(s) so they could select qualified H2B visa employees.

3.  Assist the customers with the transportation process for various H2B workers to arrive to the customer location safely (airport pick-ups only).

4.  Assist in providing housing for the H2B visa workers.

5.  Refer all legal immigration matters to immigration firms who specialized and provided that expertise, directly with it's customers.  USO connected the employers directly with immigration firms to handle all the signing of all documents, that were ultimately approved by all USO's customers and signed under penalty of perjury.

6.  In short, all USO did was find temporary international H2B visa workers for employers who qualified for such workers.

On April 24, 2011, Agent Elder and company raided my residence.  He took all my computers, files and personal belongings, and other various information. Agent Elder (AE) specficially and factually told me he was going to copy everything and I would have all my property back within 30 to 45 days.  It is a fact that I still do not have my property back, in its entirety, until present day.

During the raid, I spoke briefly to AE.  He factually and specifically told me how Mavadene Cooper from Devyne Consulting and Rebecca Naljun of Adman in the Philippines committed a crime and he was only investigating me and my company to see if I was involved.  Having nothing whatsoever to worry about, knowing I did nothing illegal, I cooperated with them,  I cooperated

in the respect of being nice and helpful.  I chose not to speak to the agents without a lawyer, since their inappropriate tactics, corruption and lies are well known from a federal standpoint.

There was an Agent in my home videotaping this entire situation.  My wife, clearly and factually asked AE why they were videoing the situation.  His response was how they needed to document that they were not causing damage or harm to our home, since they have been sued in the past for alleged damages. Ironically, that video tape has become a missing mystery.  AE made it disappear, since it contains the conversation he and I had on my couch, in the living room, where he factually stated he knew it was not me and the victims already told him who committed the visa fraud crime.

The very next day, April 25, 2011, AE and company, with their uniforms, badges and firearms visable, visited most of my South Florida customers and told them specifically, if they worked with USO/MVL, he would ensure their current H2B petitions would never be approved.  AE threatened and specifically and factually coerced management team members of the Polo Club of Boca Raton, Redstick Golf Club, Quail Ridge Country Club and Orchid Island Beach Club.

From that day forward, AE contacted all of USO's customers throughout the U.S., such as Midwest Landscaping, Aramark, Adeleman Concrete and more. All national and international contracts that USO had, all terminated their relationship immediately with USO/MVL and USO collasped over night.

Each and every customer either called me and/or emailed me pertaining to AE's defamatory and outrageous remarks.  I was not arrested, accused or indicted of any crime whatsoever at the time.  I was only "under investigation" according to AE, but he took it upon himself to destroy my company and family immediately with no probable cause.

The above indicated how USO/MVL had a solid business that was flourishing with the future of potential being unlimited.  Had it not been for the outrageous and fraudulent conduct of the defendant, USO would have become a leader in the industry.

<u>Legal Arguments</u>

<u>Count 1</u>
<u>Fraudulent Misrepresentation</u>

The four elements of fraudulent misrepresentation are:  "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false:  (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." <u>Butler v. Yusem</u>, 44 So. 3d 102, 105 (Fla. 2010)(quoting <u>Johnson v. Davis</u>, 480 So. 2d 265 (Fla. 1985)).

In Florida, in order to be actionable, a fraudulent misrepresentation must be of material fact, rather than mere opinion or a misrepresentation of law. <u>Chino Elec, Inc. v. U.S. Fid & Guar. Co.</u>, 578 So. 2d 320, 323 (Fla. 3d DCA 1991).

This occurred in this case when the defendant, The Department of Homeland Security, through Agent Elder's authority made specific and clear false reprsentations on many occassions, which in turn had a dramatic negative affect on the plaintiff.  Because of these misrepresentations, the prosecutor in the criminal case against the plaintiff, U.S. Asst. Attorney, Annette Williams, clearly and factually committed prosecutorial misconduct by knowingly and erroneously misleading the court into believing how MVL committed Visa Fraud, Fraud in Foreign Labor Contracting and False Statements.

It was impossible for USO and/or MVL to commit visa fraud.  See <u>U.S. v. Yong Ping Liu</u>, 288 Fed.Appx. 193 (5th Cir. 2008), which states how the visa fraud statute requires a showing that the defendant "knowingly" made or presented a "false statement" in an application, affidavit, or other document. The record and evidence clearly and factually shows how USO/MVL never filed, filled out or signed any type of government document whatsoever.

It was impossible for MVL/USO to commit fraud in foreign labor contracting. USO/MVL **never** contracted with one single H2B visa worker within the company's existence.  That is not the business USO was involved with.  There is not one single contract that exists between any H2B visa worker, from any country

- 4 -

within the world and USO/MVL.  USO/MVL factually **never** wrote one single paycheck to any H2B worker.  Please see exhibit 80.  Moreover, no probable cause existed at all within the criminal case of U.S. v. Lombardi.

It was impossible to make false statements to any H2B visa worker within the entire world, since USO/MVL did not hire or contract with H2B workers. None of the H2B workers within the fraudulent criminal case of U.S. v. Lombardi, ever had one single communication known to man with me.  They do not know me at all.  See exhibit 80 again.

Any fraud perpetuated directly upon the "so called victims" had to have occurred in the Philippines and is beyond the jurisdiction of the court.  See factual and material exhibit 80.  This is an acquittal from the Philippines stating how USO/MVL is innocent of all charges.

In an article named "10 more human trafficking victims arrive in L.A." by Balita Media News Services states several interesting facts:

1)  Ten more overseas Filipino workers who were petitioned arrived in Los Angeles to join their co-workers who exposed a big case of human trafficking involving a recruiting agency in the Philippines, that sends workers to the U.S.

2)  All 10 wrote a statement to narrate what happened to each and every one of them.

3)  Yaranon, a Filipino worker said he left the Philippines last July 19th with 4 others.  He arrived to New York airport, but no one from Aramark was there to meet them.

4)  Yaranon said they ended up working for Royal Hospitality Services (RH). Their contact person was Arthur Grigoryan.

5)  Just like DeGuzman (another Filipino worker), Yaranon said they were supposed to work for Aramark at $7.75 per hour.

6)  Yaranon said he hired the services of Manila-based Adman Human Resources

Placement & Promotions, Inc.  Adman collected $6,000 in fees from him.

7)  Yaranon & DeGuzman's H2b visa stated that the petitioner was "Aramark Sports LLC" doing business as Aramark and valid from 4/1/2010 to 11/30/2010.

8)  The same Department of Labor document showed that DeGuzman & Yaranon should have been working in Luray, Virginia.

9)  The Philippines Overseas Employment Agency placed Adman in a "preventative suspension" status.

As noted in the above, as well as the factual exhibit number 80, USO/MVL was not involved whatsoever with this alleged crime, giving Agent Elder no probable cause at all.  The 10 Filipino's wrote statements pertaining to what happened and none of those were part of my discovery.  Furthermore, I have never seen those statements at all.

Yaranon left the Philippines with final destination to Biloxi, MS.  He states how ARAMARK was not there to pick him up in New York, when he factually knew the jobs for ARAMARK were located in Luray, Virginia.  Why didn't Yaranon, DeGuzman and the other arrive to the door steps of Aramark in Luray Virginia?  Why would Aramark be waiting for them in New York?  The answer is simple.  The Filipino workers were conspirators who knew they were going to work for the Beau Rivage and Royal Hospitality in Biloxi and Agent Elder knew this as well.

Cases in point.  Hyder v. Keisler, 506 F.3d 388 (5th Cir. 2007), the international workers committed a crime by deliberately lying to the U.S. Embassy abroad. Dishonesty or lying was an essential element that involved moral turpitude. Also see Iqbal v. Hasty, 490 F.3d 143, 147 - 148 (CA 2 2007), arrested on charges of fraud in relation to identification documents and conspiracy to defraud the U.S., the H2B workers conduct was "consistent with conspiracy." We know the individual had to lie to their own country and to the U.S. Embassy, in order to obtain a valid visa under false pretenses, so they could work in Mississippi instead of Virginia.  Agent Jason Elder knew this or should have known due to the factual 5th circuit case law right in his backyard.

At the end of the day, the Filipino workers conspired with Adman, the BR

and RH to gain entry into the U.S. and Agent Elder factually knew and/or should have known this.

Furthermore, plaintiff suffered actual substantial damage and the defendant's deception and outrageous fraudulent conduct was the proximate cause of the plaintiff's injuries.

This factually occurred with Agent Elder on more than several occassions when he committed perjury, made a suppression or fraudulent misrepresentation of the truth with the intention either to obtain an unjust advantage for one part or cause a loss or inconvenience to the other. The result of Agent Elder's actions caused permanent and irrepairable damage to the plaintiff.

During the sentencing hearing in the criminal case of U.S. v. Lombardi, case number 1:11-cr-00076-WJG-RHW, Agent Elder, on August 15, 2012, testified under oath on page 25, lines 2-4 and stated the following:

"Yeah, there are approximately twenty-something that were in LA and went directly to work from their country straight to the Beau Rivage."

Then Agent Elder on line 7, states, "that's correct" when asked if he interviewed the H2B visa workers who went straight from the Philippines to the Beau Rivage. However, he still fraudulently misrepresented the facts to cause direct harm and injury to me.

It is clear and a fact how the Filipino H2B visa workers conspired with others to lie to their own country and the U.S. Embassy, in order to obtain a valid visa, under false pretenses, so they could work in Mississippi instead of Virginia. There is no other way possible within the visa obtaining process abroad to obtain a visa like this, within this particular situation.

Furthermore, Agent Elder stated how I personally directed these workers away from Aramark and defrauded them into working in Mississippi, violating their H2B rights. Agent Elder stated how the workers were recruited by me, hence the charges of false statements and fraud in foreign labor contracting when that was impossible. The unreliable presentence report in the case of U.S. v. Lombardi proves how Agent Elder (AE) gave an abundance of

expressions that gave rise to the level of fraudulent misrepresentations.

In the article "the case of the 11 trafficked OFWs in Los Angeles" the following are some of the facts:

1)   They had been recruited by an agency called Adman Human Resources Placement & Promitions, Inc.

2)   Upon arrival in the US, their contact there said the original job in Virginia was not available and told them to proceed to Biloxi, MS to work at a hotel called Royal Hospitality.

3)   They were charged double for thier living quarters.

4)   The workers were warned by hotel management that any attempt to escape would subject them to a legal suit and reported to US Immigration authorities, who would deport them.

5)   Adman was put on preventative suspension on 3/23/2011 in violation of POEA rules.  They were charged with 14 counts of section 2(c) Rule 1, Part VI of the rules and regulations governing the recruitment and employment of land-based overseas workers; 14 counts of section 2(e) engaging in acts of misrepresentations in connection with recruitment and placement of workers; and 14 counts of section 2(q) deploying workers to principals not accredited/ registered by the administration.  Adman's license was cancelled.

6)   Adman was ordered to return the amounts of money collected from the workers.

7)   Adman had a history of 31 cases filed against them.  Ten of those cases have been decided, all of them against Adman.

8)   SA Miguel Palomino of ICE division of the Department of Homeland Security agreed that ARAMARK must be investigated.  It was to be headed by Agent Jason Elder.

Even after knowing these facts, Agent Elder still created and made outrageous

fraudulent misrepresentations pertaining to USO/MVL.  It is clear how Adman created this scheme in the Philippines which is out of the jurisdiction of AE.

AE states how I redirected the H2B visa workers to proceed to Biloxi, according to the unreliable PSR, but then clearly and factually states on the record how I was not the contact for these workers.  Page 24 of the 8/15/2012 sentencing hearing transcript has the following testimony:

Mr. Weber (public defender):  They ended up at Royal Hospitality because they had a friend or relative that was working for that company?

Agent Elder:  That is correct.

Mr. Weber:  It is not because Michael Lombardi steered them to Royal Hospitality?

AE:  those 13, correct.

On page 25, the following testimony took place:

Mr. Weber:  And the ones that went straight from the Philippines to the Beau Rivage, you and the other agents interviewed most of them?

AE:  That's correct.

Mr. Weber:  None of those individuals even made reference to Michael Lombardi?

AE: Not to Michael Lombardi or Rebecca Najulan.

In previous testimony within this situation we have already established through AE's testimony that no money was ever transferred to USO/MVL from Adman or Rebecca Najulan.  In fact, there has never been one single business transaction or personal transaction between Adman, Rebecca Naljun or USO/MVL ever.

AE, knowing USO/MVL never worked with Adman, BR, RH and never communicated to any of the H2B visa workers within this situation, AE's fraudulent investigation states how I charged the H2B visa workers with illegal recruitment fees (which are not illegal according to Castellanos).  I was responsible for the overpayment in housing costs the H2B workers paid to RH and even though Adman, who

charged recruitment fees to the H2B workers and Adman is ordered to pay that money back to each and every worker, AE knowingly and erroneously misled the FIFTH CIRCUIT FEDERAL COURT into charging me with restitution for these amounts that are already being paid back by others.  To be 100% clear, AE also said I was responsible for the housing deductions that RH deducted from the H2B workers paychecks when USO/MVL never conducted one single transaction with RH within the history of the Earth's existence.

It is a material fact how the H2B workers **never** communicated with me, **never** paid me for anything, **never** were directed by me to work for another employer, **never** were given fraudulent petitions by me, and were **never** contracted by me for any type of employment whatsoever.

The workers being "warned" by the hotel was clearly and factually conducted by the BR and RH.  Adman was suspended and I was eventually acquitted by the Filipino Government, which is exhibit 80.

The following are some of the many fraudulent misrepresentations of material fact Agent Elder made:

1)  AE, under oath, lied and stated to the district court how I charged the H2B visa workers illegal recruiting fees.  Per the article above, Adman Human Resources Placement & Promotions, Inc. collected the fees.  According to the FIFTH CIRCUIT in AE's backyard, there are no such illegal recruiting fees.  See the factual and material case of Castellano-Contreras v. Decatur Hotels, LLC, 662 F.3d, 393, 2010 WL 3816016 (5th Cir. Oct. 1, 2010).  On Ocotber 1, 2010, the FIFTH Circuit, en banc, ruled in favor of the defendants, holding, as a matter of law, H2B worker's inbound travel, visa and recruitment expenses are **not** reimbursable under the FLSA.  Moreover, see Miro Aldoman Saucedo, ET. AL. v. Five Star Contractors, ET. AL., Civil No. 1:09CV268-HSO-JMR (6/6/2011), the court held that:  "no statute or regulations expressly states that inbound travel expenses must be advanced or reimbursed by an employer of an H-2B worker." Similary, no law or regulation provides that fees for the employee side of the visa application process must be paid by the employer.  See 22 C.F.R. §40.1(L)(1)(2010).

2)  There was never one single business transaction or any kind of transaction

within the history of the Earth's existence between USO/MVL or Adman or Rebecca Najulan who owned and operated Adman.   During the 8/15/2012 sentencing hearing from the U.S. v. Lombardi criminal case, the following transpired between my former public defender (John Weber) and AE.  This is on page 26, lines 15-23:

Mr. Weber:  There are no wire transfers from Rebecca Najulan in the Philippines to Michael Lombardi.

AE:  Not specifically from her name.

Mr. Weber:  Were they from somebody that's she's affiliated with?

AE:   There were other wires transfers that list the Philippines or Indonesia.

Mr. Weber:  But you know of no relationship between those wire transfers and Rebecca Najulan and Adman--

AE:  Not directly, right.

3)  Jason Elder perjured himself by stating how I received wires from Indonesia. Lets keep in mind how the recored clearly and factually showed how all the "so called victims" are all of Filipino nationality.   There is not one Indonesian. Again, all the money received by me and/or my company was legal according to the FIFTH CIRCUIT.

4)   AE, from a self-prepared spreadsheet stated how a wire I received from Thailand was illegal when the H2B visa program is not available in that country.

5)   AE stated how I charged Johnny Johnson of Southern Mississippi Pine Straw for H2B workers when it was clearly and factually for attorneys fees and advertising.

6)   AE stated how applications were never filed for Johnny Johnson, insinuating how I stole the money, when the facts are the exact opposite.

7)  Again, there are no such illegal fees, but AE perjured himself by convincing the Court I should pay this money back to the H2B visa workers through the Court by way of restitution, when Adman/Rebecca Najulan has already been ordered to do so by the country of the Phillippines who have acquitted me of all charges.  See "the case of the 11 trafficked OFWs in Los Angeles," which was written on May 25, 2011.  This case contains the results of an investigation by Rep. Walden Bello, Chair of the Committee on Overseas Workers' Affairs  (COWA), House of Representatives, Philippines.

Again, these are just some of the many fraudulent misrepresentations by the defendant that gave rise to the level of fraudulent misrepresentations.

On page 20-21 of the 8/15/2012 Sentencing hearing for the case of the U.S. v. Lombardi, the following testimony took place:

Mr. Weber:  And just so the record is clear at this point, am I not correct that it is illegal for a recruiter in the U.S. to charge a fee to an H2B worker?

AE:  That's correct.

Mr. Weber then gets the question across to AE how U.S. recruiters should be paid by the employers of H2B workers and not from the H2B workers themselves because collecting recruitment fees from the H2B workers is "actually illegal."

AE responds by saying - - "that's illegal, that's right."  However, this is just another perjury in the life of AE, since in the 2010 case, named Castellanos, in the 5th Circuit, this federal case law stated the exact opposite. AE cannot stop making fraudulent misrepresentations of a constitutional magnitude. AE's fraudulent misrepresentations cost me my liberty, my business, my marriage and my family.  The result of AE's actions, perjury and misconduct caused me irrepairable harm and damage.

### Count 2
#### Tortious Interference with a contract

The plaintiff and his company had contracts throughout the globe.  Because

of the acts of the defendant, the result was irreparable harm and damage to the plaintiff.

"Tortious interference with a business relationship requires a plaintiff to allege (1) the existence of a business relationship, (2) knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with the relationship, and (4) damage to the plaintiff as a result of the relationship." Cherry v. D.B. Zwirn Special Opportunities Fund, No. 8:09-CV-33, 2010 US Dist Lexis 6468, 2010 WL 415313, at *8 (M.D. Fla. Jan. 27, 2010), 11th Circuit.

"The law requires an existing contractual or business relation with a third party before there can be interference with that relation." Bush v. Goldman Sachs & Co., 544 So. 2d 873, 875 (Ala. 1989); see also Puncy v. Vulcan Materials Co., 920 F. Supp. 1566, 1585 (N.D. Ala. 1996 11th Circuit).

By AE's own acts, he willfully and intentionally affected the contractual relationship between all of USO's global customers.  This interference caused irreparable injury to the plaintiff who's livelihood was destroyed, as well as being the cause for him being in prison.

"The Eleventh Circuit has stated that 'a business relationship need not be evidenced by a contract, but generally require an understanding between the parties that would have been completed had the defendant not interfered.'" E-Z Pack Mfg, LLC v. RDK Truck Sales & Serv., Inc., No. 8:10-CV-1870, 2011 US Dist Lexis 97274, 2011 WL 4343790 at *10 (M.D. Fla. Aug. 10, 2011).

That did occur here when the defendant intentionally damaged the spectacular relationship that the plaintiff had with his customers global wide, as well as his national and international reputation within the industry.

### Count 3

#### Negligent Misrepresentation

Negligence in itself is a flexible term for failure to use ordinary care under the particular factual circumstance revealed by evidence in a lawsuit.  It is also conduct which falls below the standard established by law for the

protection of other against unreasonable risk of harm.   Restatement second of torts §282.

The four elements of Negligent Misrepresentation are: (1)  there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.   Baggett v. Electricians Local 915 Credit Union, 620 So. 2d 784, 786 (Fla. 2d DCA 1993).

In this instance case, the defendant made numerous and continuous improper misrepresentations that were negligent.   This in turn, caused me to be the receipient of the injury received, due to the negligent misrepresentation, since "the tort of negligent misrepresentation occurs when there is a breach of duty to supply correct information to plaintiff."   Doucet      LaFourche Parish v. Fire Protection Dist. No. 3, 589 So. 2d 517, 519 (La. Ct. App. 1991).

### Count 4
### Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, a plaintiff must allege that: (1) the defendant acted intentionally or recklessly; (2) the defendant's actions were extreme and outrageous; (3) a casual connection between the wrongful conduct and the emotional distress; and (4) the plaintiff suffered severe emotional distress.   Walker v. Bank of AM, N.A., 2014 US Dist. Lexis 3829 (11th Cir. 2014).

This is exactly what happened in the instant case.   The conduct of the defendant was extreme and outrageous.   This is documented by the factual and material exhibits shown, as well as the testimony from Agent Elder himself.

These actions directly caused emotional distress to the plaintiff, due to the false and fraudulent misconduct of Agent Elder, which caused the plaintiff to do a 51 month prison sentence.   This, in turn, shattered his family

relationship which not only left him financially without anything, but emotionally as well.

This fact is well documented by the Psychology Department at FCI-Miami prison, which had and is currently treating the plaintiff for emotional distress. Because of this he was forced to take medication, which is well documented in his medical records at FCI-Miami.

## Count 5
### Tort of Outrage

A tort of outrage is a claim for intentional infliction of emotional distress and is detailed in the prior section.  However, additionally, "extreme and outrageous conduct is so extreme in degrees as to go beyond all possible bound of decency, and to be regarded as atrocious and utterly intolerable in a civil community." Twyman v. Twyman, 855 SW 2d. 619, 621 (Tex 1993). See also Van duzer v. U.S. Bank Na.

That resulted here, when the defendant, through untruthful statements that were so extreme and blantantly false, that the plaintiffs life was destroyed in all matters.  He financially lost everything and additionally his personal relationship with his wife and children were completely destroyed as well.

## Count 6
### Defamation

The elements of Defamation are: (1) publication of the statement; (2) falsity; (3) negligence as to the statement's falsity; (4) actual damages; and (5) the statement must be defamatory.  Ward v. Casual Rest. Concepts, Inc., No.: 8:10-CV-2540, 2011 US Dist. Lexis 69712, 2011 WL 2600511, at *6 (M.D. Fla. June 29, 2011).

A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se.  See, E.G., McLver v. Tallahassee Democrat, Inc., 489 So. 2d 793, 794 (Fla. 1st DCA 1986); Diplomat Electric v. Westinghouse Electric Supply Co., 378 F.2d 377, 383 (5th Cir. 1967).

This occurred in this case when the remarks and actions of the defendant led to me being first criminally indicted and then being convicted to a 51 month prison sentence.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ascroft v. Iqbal, 556 US 662, 129 S.Ct. 1937, 1949, 1732 Ed. 2d. 868 (2009).

## Count 7
### Tortious Interference with Business Relationships

The tortious interference with business relationship "occurs when a person unlawfully diverts prospective customers away from one's business." Par Indus., Inc. v. Target Container W., 708 So. 2d 44, 48 (Miss. 1998); See also Cenac v. Murray, 609 So. 2d 1257, 1268.  This case explains that tortious interference with a business relationship occurs "when a wrongdoer unlawfully diverts prospective customers away from one's business thereby "encouraging" customers to trade with another."

The elements to prove such a claim are: "(1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual damage and loss resulted." MBF Corp v. Century Bus Commc Ins. Inc., 663 So. 2d 595, 598 (Miss. 1995).  Also see, United Brand Inc., v. Tenders, 868 F. Supp. 2d 572 (5th Cir. 2012, as well as PDN, Inc. v. Loring, 843 So. 2d 685, 688 (Miss. 2003).

This occurred in this case when AE gave deliberate and fraudulent statements to my customers and to the district court, which directly impacted me and my family in the worst possible way that is conceivable.  It can be proven beyond any doubt that AE is responsible for material fraudulent statements he told to all parties about USO/MVL.  The damage he caused is irrepairable.

These acts were intentional and willful, since when he made the remarks and put forth his remarks into action that he knew were false.  The acts

themselves caused damage to the plaintiff in his lawful business.  AE's actions
were conducted with unlawful purpose, making material and damaging mis-
statements and finally actual damage did, in fact result.  This was monetary
in nature, since all current and future earnings were lost, as well as the
plaintiff's business relationships with all his customers globally.  Furthermore,
his right to liberty was taken away with a 51 month prison sentence and
inappropriate restitution.  "Words which are actionable in themselves, or
per se, necessarily import general damages and need not be pleaded or proved
but are conclusively presumed the result.  Bobenhausen, v. Cassat Ave.
Mobile Homes, Inc., 344 So. 2d at 281 (Fla. 1st DCA 1977).

"Similarly, a cause for action for tortious interference with business relations
does not accrue until existing negotiations, which are personally certain
of resulting in a contract, are interferred with such that the negotiations
terminated and harm to the plaintiff results."  Hill v. Heritage Resources,
964 SW 2d. 89, 116 (Tex: App-El Paso 1997 pet. denied); Million v. AM
Int'l Group, INc., 2005 US Dist. Lexis 8864 (5th Cir. 2005).

In the instant case, contracts existed with customers throughout the globe,
which grew larger through time and this was interfered with, since all my
current and future contracts were terminated within the industry.   The
end result was the ~~entire~~ entire global business collasped and caused damage to
a reputation that will be impossible to reestablish.  My reputation and business
are 100% irreparable, as well as my family life.

Count 8

Malice

A defendant acts with actual Malice if the defamatory statement is made with
"knowledge that it was false or with reckless disregard if it was false or
not."  New York Times Co. v. Sullivan, 376 US 254, 289-290, 84 S.Ct. 710
11 Ed. 2d 686; Wallace v. Perry, 423 B.R. 215 (5th Cir. 2010).

Additionally, it should be noted that malice may be proved through either
direct or indirect circumstantial evidence.  Thus, if a plaintiff proves that
the defendant's defamatory statements were made with malice by clear and
convincing evidence, a court may impose punitive or exemplatory damages."

"Evidence is clear and convincing if it supports a firm conviction that the facts to be proved are true."  Transportation Insurance Co. v. Mariel, 879 SW 2d. 10, 23 (Tex 1994); see also Wallace v. Perry.

That is the case here, since plaintiff can prove with clear and convincing evidence that the defendant's statements, actions and remarks were not only false, but the defendant knew they were false when they made them, which directly affected the plaintiff.  The fact is easily documented and shown specifically within the enclosed exhibits and quoted testimony in federal court.

AE's actions, which are documented, speak just as loud as his words.  There is no doubt whatsoever that his actions were deliberately done and did cause harm to the plaintiff.  AE committed actual and factual perjury.  Since AE is the one who caused the damage, he is responsible for making the plaintiff whole.

## Count 9
### Malicious Prosecution

To prove malicious prosecution, a plaintiff must show the following:  "(1) A criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused."  Wood v. Kesler, 323 F.3d 872, 881-882 (11th Cir. 2003).

This is exactly what happened to me due to AE's actions.  Through AE's individual actions, he has violated my constitutional rights.  Ashcroft v. Iqbal, 556 US 662, 676, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009).  It is clear and factual how AE maliciously prosecuted me, and how i was severly damaged by him.

AE had no such probable cause, since there were no such "facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense."  Gerstein v. Pugh, 420 US 103, 111, 95 S.Ct. 854, 43 L.Ed 2d 54 (1975).  Reasonable officers in the same circumstances and possessing the same knowledge as the defendant would have never believed

that probable cause existed to arrest me.  Not with  the concrete evidence
that is perfectly black and white.  There were never any  such reasonable
grounds to suspect that I had committed or was committing a crime or that
a place contained specific items connected with a crime.

The issue of material fact is clear.  Agent Elder never had probable cause
to arrest me on, based on the evidence and case law that states the exact
opposite.  Buckley v. Fitzsimmons, 509 US 259, 287-88, 113 S. Ct. 2606,
125 L.Ed. 2d 209 (1993).  Also, Spadaro v. City of Miramar, 2013 US Dist.
Lexis 16714 (11th Circuit).

AE relied on false and fraudulent evidence and threatened and coerced me
to sign a plea agreement or he would have indicted my wife.  This served
as the basis for his probable cause that did not exist whatsoever.  It is
difficult to fathom why securing such a fraudulent determination transmogrifies
unprotected conduct into protected conduct.

Moreover, the Eleventh Circuit held in Kingsland, a lack of probable cause
may be demonstrated by the arresting officer's failure to conduct a reasonable
investigation.  AE's investigation at best was mickey mouse.  Specifically,
the case law within his backyard contradicts everything within his investigation,
as well as his allegations.  Also, the factual documented evidence and his
perjured testimony prove his investigation was not reasonable.

Brady protects "the defendant's right to a fair trial mandated by the due
process clause of the fourteenth amendment to the constitution."  Porter
v. White, 483 F.3d 1294, 1303 n.4 (11th Cir. 2007)(quoting U.S. v. Agurs,
427 US 97 107, 96 S.Ct. 2392, 49 L.Ed. 2d 342 (1976).

"A former criminal defendant who was denied his due process right to a
fair trial as a result of withholding of exculpatory evidence may have a due
process claim for money damages against a police officer under §1983."  Barber
v. Doe, No. 09-60635-CIV-MORENO, 2010 US Dist. Lexis 88457, 2010 WL
3384766, at *6 (S.D. Fla. Aug. 5, 2010) (citing Porter, 483 F.3d at 1294;
McMillian v. Johnson, 88 F.3d 1554 (11th Cir. 1996)).

AE absolutely violated my right to a fair trial, since he created false information

likely to influence a jury's decision and forwards that information to prosecutors." Brandon v. City of New York, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010)

Qualified immunity is intended "to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation, protecting them from suit all but the plainly incompetent or one who is knowingly violating federal law."  Case v. Eslinger, 555, F.3d 1317, 1325-26 (11th Cir. 2009).

To do so, the plaintiff must prove:  (1) that the defendant violated a constitutional right and (2) that his right was clearly established at the time.  Case v. Eslinger.

This has been proven beyond any doubt by AE's actions, perjury and disregard for true evidence and facts in order to provide actual justice.  The record clearly and factually reflects his inconceivable behavior and disregard for the constitution of the United States.

Conviction obtained through false evidence violates due process right to fair trial.  Pyle v. Kansas, 317 US 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

Where conviction resutled from use of perjured testimony and suppression of exculpatory evidence, there was sufficient allegation of deprivation of constitutional rights.  See Donnelly v. DeChristoforo, 416 US 637, 646, 94 S.Ct. 1868, 40 L.Ed. 2d 431 (1974).

Again, it is beyond any doubt whatsoever that AE committed perjury.  It is clearly and factually recorded on the record and the jury within this case will not believe thier eyes or ears when they see all the factual evidence and case law.

Agent Elder's intentional and reckless ommisions should have invalidated the warrant that was issued to him, due to the inclusion of the omitted facts, which surely would have prevented a finding of probable cause.  Madiwale v. Savaiko, 117 F.3d 1327 (11th Cir. 1997).

The fact is, Agent Elder was sworn in under oath in support of his inappropriate perjury conduct that commenced and continued a criminal prosecution against me, that ultimately falsely imprisoned me for 51 months.  He committed aggrevated perjury against me, which violated the substantial rights that I have.

AE "fraudulently misrepresented the information with the intention of inducing criminal proceedings that otherwise have no merit."  McCray v. City of Dothan, 169 F. Supp. 2d.  1260, 1293 (M.D. Ala. 2001).

"When probable cause is shown to be lacking, malice is essential to recovery." Delchamps, Inc. v. Bryant, 738 So. 2d 824, 832 (Ala. 1999).

I have been unlawfully detained by AE whereby he had deprived me of my personal liberty.  I have direct evidence that proves the existence of fact without inference or presumption to what has been done to me by Agent Elder.  Morris v. Emory Clinic, INc., 402 F.3d 1076, 1081 (11th Cir. 2005).

AE does not even have evidence of facts or circumstances from which the existence or nonexistence of fact in issue may be inferred.  Wright v. Southland Corp., 187 F.3d 1287, 1294 (11th Cir. 1999); King v. Cessna Aircraft Co., 2010 US Dist Lexis 131899 (11th Circuit).

Agent Elder's perjury is prominent and factual.  "The requirements of perjury are that '(1) the testimony must be under oath or affirmation; (2) the testimony must be false; (3) the testimony must be material; and (4) the testimony must be given with the willful intent to provide false testimony and not as a result of mistake, confusion, or faulty memory.'"  U.S. v. Ellisor, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008)(quoting U.S. v. Singh, 291 F.3d 756, 763 n.4 (11th Cir. 2002).

These requirements are easily proven by the sentencing hearing where AE committed the actual perjury and within his entire investigation, as well as the case law within his backyard that contradicts everything he has said on the record in federal court.

Damages

In computing the amount of damages, many things have to be considered. Monetary damages, which include current earnings, as well as future earnings. In addition, based on the significance of the permanent and irreparable harm, punitive damages can also be considered, since the defendant should further be punished for their actions.

Any person having suffered injury from defamation is entitled to recover damages.  Florida law recognizes two categories of compensatory damages for defamation:  general and special.  Bobenhausen v. Cassat Ave. Mobile Homes, Inc., 344 So. 2d 279, 281 (Fla. 1st DCA 1997).

General damages are those which the law presumes must naturally, proximately and necessarily result from publication of the libel or slander.  They are allowable whenever the immediate result is to impair the plaintiff's reputation, although no actual pecuniary loss is demonstrated.  20 Fla. Jur. Libel and slander sections 6, 88.  id.  Special damages, on the other hand, "do not result by implication of law", and "it is necessary for a plaintiff to show his special damages proximately resulted from the defamation."  Bobenhausen, 344 So. 2d at 281.

Compensatory damages are not limited to out-of-pocket loss.  Gertz v. Welch, Inc., 418 US 323, 94 S.Ct. 2997, 41 L.Ed. 2d 789 (1974). The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering. id.

"Of course, ... all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." Gertz, 418 US at 349, 94 S.Ct. 2997, 41 L.Ed. 2d 789.

There is "considerable flexibility in the form of necessary proof of damages. What money a business would have made but for the interference of another party has to be estimated." Lynn v. Soterra Incorporated, 802 So. 2d 162, 170 (Miss. App. Ct. 2001).

Furthermore, in AmSouth Bank v. Gupta, 838 So. 2d 205, 214 (Miss. 2002), addressed the necessity of customer diversion to demonstrate interference with business relations holding that "while the tort has its origin in efforts

- 22 -

of a third party directed against a plaintiff's customers, conduct interferring with the plaintiff may suffice."

Moreover, the proof in such a case must provide such certainty at the nature of the particular case may permit to "enable the trier of facts to make a fair and reasonable estimate of the amount of damage." Id at 171 (citing Freeman v. Huseman Oil Intern, Inc., 717 So. 2d. 742, 746, (Miss. 1998). Also, "where it is reasonable certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery....the plaintiff will not be denied substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating the loss." Raines v. Bottrell Insurance Agency, Inc., 992 So. 2d. 642, 647 (Miss. Ct. App. 2008) (Citing Cain v. Mid-South Pump co., 458 So. 2d 1048, 1050 (Miss. 1984).

In fact, in Koehring Company v. Hyde Construction Co., 254 Miss. 214, 178 So. 2d 838, 854 (Miss. 1965), the Mississippi Supreme Court held "that a party will not be able to escape liability because of lack of perfect measure of damages...." Therefore a reasonable basis for computation and the best evidence, which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of the loss is sufficient proof."

In summary, the damages are provable and it is extensive. There was proximate causation and it was forseeable for without AE's false statements, the plaintiff would have not been indicted. There is no question that because of his erroneous statements is why, in fact, the plaintiff was indicted, which caused him to lose his business and permanently damaged his reputation. this is irrepairable damage.

The plaintiff has direct evidence, which proves the existence of fact without inference or presumption. Morris v. Emory Clinic, Inc.

Therefore, the plaintiff requests punitive damages as well, since traditionally punitive damages are "awarded in addition to actual damages when the defendant acted with recklessness, malice or deceit," and these damages are viewed as a "way of penalizing the wrongdoer." Cooper Industries v. Leatherman

<u>Tool</u>, 532 US 424, 432, 121 S.Ct. 1678, 149 L.Ed 2d. 674 (2001).

Furthermore, when determining damages, the court cannot forget that "compensatory damages are intended to redress the concrete loss that plaintiff has suffered by reason of the defendant's wrongful conduct.  Punitive damages, which have been described as 'quasi-criminal', operate as 'private fines' intended to punish the defendant and to deter future wrongdoing."  See also <u>Schroeder v. Greater New Orleans Credit Union</u>, 2012 US Dist. Lexis 171139 (5th Circuit).

Therefore, in summary, the plaintiff should be entitled to punitive, as well as compensatory damages.

<u>Trial by Jury of my Peers</u>

Because of the extensive amount of facts, as well as damages, such like this occurs on a way too often basis, a trial by jury of his peers is what is desired by the plaintiff.

<u>Conclusion</u>

Based upon all the illegal acts done to the plaintiff, as well as the long and short term effects on his financial condition, the plaintiff hereby requests a settlement in excess of Fifty Million dollars, which includes compensatory, as well as punitive damages.  Also, all litigation costs and attorney's fees.

Respectfully submitted,

_____
Michael V. Lombardi

Date 8/18/2014

PERJURY STATEMENT

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct and that this was placed in the prison mailing system on _____8/18/2014_____.
                    (month, date, year)

Executed (signed) on___8/18/2014_____(date)

_____
Signature of Plaintiff
Michael V. Lombardi (U.S. Opportunities, LLC)



USPS TRACKING #

9114 9011 5981 8975 3451 69

UNITED STATES POSTAL SERVICE®

Label 400 Jan. 2013
7690-16-000-7948



USMS INSPECTED BY:

Vincent Lombardi 16314043
Federal Correctional Institution
P.O. Box 779800
Miami, FL 33177

Paul G. Rogers Federal Building
U.S. District Courthouse
Southern District of Florida
Attn: Clerk of Court
701 Clematis Street,
West Palm Beach, FL 33401
Room 402

